**HERCULES INCORPORATED, Plaintiff,**

v.

**EXXON CORPORATION, Defendant.**

Civ. A. No. 3439.

United States District Court,
D. Delaware.

May 26, 1977.

---

David F. Anderson and William S. Potter, of Potter, Anderson & Corroon, Wilmington, Del., of counsel, Caspar C. Schneider, Jr., of Davis, Hoxie, Faithful & Hapgood, New York City, for plaintiff.

Arthur G. Connolly, Jr., of Connolly, Bove & Lodge, Wilmington, Del., of counsel, Thomas F. Reddy, Jr., Berj A. Terzian, Jonathan A. Marshall, Vincent J. Vasta, Jr. and Ronald A. Bleeker, of Pennie & Edmonds, New York City, and Lee Chasan, Linden, N.J., for defendant.

CALEB M. WRIGHT, Senior District Judge.

Presently before the Court are two discovery motions filed by defendant, Exxon Corp., to compel production of plaintiff's withheld documents and to compel answers to interrogatories. The motions arise out of an action charging defendant with patent infringement. Defendant has counterclaimed for invalidity, unenforceability and non-infringement. The patent in suit, U.S. Patent No. 3,211,709 to Adamek, et al. (the "Adamek patent"), discloses a type of artificial rubber which is readily sulfur-vulcanizable according to commonly used methods. The claims cover an elastomeric copolymer consisting of at least two alpha-olefins[1] together with an unsaturated bridged-ring diene[2] as a third monomer. The claims are limited by the requirement that the bridged-ring hydrocarbon contain at least two double bonds, one of which must be in the bridged-ring structure. The location of the second double bond, or of any other double bond, is unspecified. Plaintiff contends that the claims are broad enough to cover the use, as the third monomer, both of bridged-ring hydrocarbons with double bonds inside a ring structure[3] and of bridged-ring hydrocarbons with one double bond inside the ring structure and a second double bond in a linear side-chain substitu-

1. An alpha-olefin is a chemically active hydrocarbon containing one carbon-to-carbon double bond connecting the first carbon atom in the chain to the adjacent carbon atom. The two alpha-olefins used most commonly for artificial rubbers are:
 1) ethylene

 2) propylene

 Artificial terpolymer rubbers using two alpha-olefins and a third monomer are often referred to as EPT rubbers.

2. A diene (or diolefin) is a chemically active hydrocarbon containing two carbon-to-carbon double bonds. A bridged-ring (or bicyclic) diene is one in which the carbon atoms are arranged in a cyclic, or closed chain structure, and two non-adjacent carbon atoms in a ring are joined by a bridge of one or more carbon atoms.

Generalized structure of a bridged-ring hydrocarbon from 1 McGraw-Hill Encyclopedia of Science & Technology 278–279 (1971).

The bridged-ring diene used most frequently in the examples in the Adamek patent is dicyclopentadiene (DCP), which has the following structure:

3. *I. e.,* DCP, illustrated *supra,* n. 2.

ent. The allegedly infringing products of defendant are both of the latter variety, with one double bond exocyclic to the ring structure.[4]

The U.S. application for the Adamek patent was filed in 1958 by Dunlop Co., Ltd., a British corporation, claiming the priority of two 1957 British applications. Rights to the application were assigned to Hercules in November, 1961. During the prosecution of the application, an interference was declared between the Adamek application and a U.S. Patent No. 3,000,866 issued to Tarney which disclosed and claimed an EPT sulfur-vulcanizable rubber with DCP as the third diene. Adamek was awarded priority on the basis of the British filing dates. The patent issued on October 12, 1965.

I. *Motion to Compel Production.*

Since filing of the complaint in this action, both parties have engaged in substantial discovery through interrogatories, depositions and requests for production of documents.[5] The present motion to compel production concerns 255 documents which plaintiff claims are protected by attorney-client privilege or work product immunity. Defendant alleges that any protection which might attach to the documents in question is vitiated by fraud or waiver. In support of its allegations of fraud, defendant has presented to this Court a large number of documentary exhibits. The withheld documents were produced to the Court for *in camera* inspection, together with a copy of the file wrapper of the

Adamek application and copies of certain produced documents which defendant claims constitute a waiver of privilege.

For the most part, the disputed documents are communications between Hercules patent department attorneys and members of the Hercules operating divisions or research department or between patent department attorneys and outside counsel, Davis, Hoxie, Faithful and Hapgood.[6] Some communications were also sent to house counsel in Hercules Legal Department. Claims of attorney-client privilege or work product are also made as to certain internal memoranda, drafts and communications of the Patent Department attorneys or of outside counsel. As the documents embrace a wide range of subject matter, they have been classified into the following categories:

I. Documents relating to the prosecution of the application for the patent in suit.

II. Documents relating to *Adamek, et al. v. Tarney,* Interference No. 93,018.

III. Documents relating to *Hercules v. Copolymer,* Civil Action No. 76–25, in the Eastern District of Louisiana.

IV. Documents relating to the present action.

V. Licenses and agreements relating to the patent in suit.

VI. Documents relating to the scope of the Adamek application.

VII. Documents relating to infringement of the Adamek patent.

VIII. Miscellaneous withheld documents.

---

4. The two accused products are:
 1) methylene norbornene:

 2) *ethylidene norbornene:*

5. At oral argument, counsel for defendant represented that close to 40,000 documents have already been produced and depositions taken of 15 witnesses, involving 13,000 pages of transcript. This is the first discovery motion which either party has brought before the Court. *See,* Transcript of Hearing before Wright, J., February 8, 1977, p. 4.

6. The firm of Kenyon, Kenyon, Reilly, Carr and Chapin was also involved as outside counsel with respect to a few documents. Members of the firm who either sent or received such documents were Mandelbaum and Parsell.

Plaintiff has submitted a schedule listing the identification of each document and its recipients, and the grounds supporting the claims of attorney-client privilege or work product immunity.

▮ As with any claim of privilege made in connection with patent matters, the problem of classification into protected and non-protected communications is troublesome. *Jack Winter, Inc. v. Koratron Company, Inc.,* 54 F.R.D. 44 (N.D.Cal.1971). Patent attorneys, particularly those employed in corporate patent departments, often serve dual functions—as legal advisers and as business advisers. Communications between those attorneys and members of operating or research departments often concern technical information which may or may not be relevant to particular legal advice requested from the attorney. As to much of that information, the attorney may be acting merely as a conduit, to relay the data to the Patent Office as part of an ex parte patent application. There is a legitimate public interest in insuring that the applicant is not able to circumvent his duty of full disclosure to the Patent Office merely by channeling information into the hands of an attorney. *In re Natta,* 410 F.2d 187 (3rd Cir. 1969). Defendant's allegations of fraud and waiver add further complications. Documents which otherwise satisfy the criteria for attorney-client or work product protection may be discoverable if made in furtherance of a fraud on the Patent Office or if the protection has been waived. The Court has, therefore, examined the documents individually at two levels: to determine first whether the document falls within the scope of the claimed protection; and, second, whether that protection has been vitiated by fraud or waived.

▮ Although defendant attempts to resuscitate the question of the applicability of attorney-client and work product protection to patent matters, that dispute appears now to be well settled. Almost every court which has considered the problem in recent years, including the Third Circuit, has found that communications with respect to patent prosecution or litigation matters may be protected, regardless of whether the attorney is outside counsel, "house" counsel or patent department counsel.

"The court is not impressed with defendant's argument to the effect that those privileges [attorney-client privilege and work product immunity], if existing at all, are deprived of real significance where patents are the subject of the communication. The argument is based in the main upon Judge Fechy's (sic) order in *Zenith Radio Corp. v. Radio Corp. of America,* 121 F.Supp. 792 (D.Del.1954) and *Georgia-Pacific Plywood Co. v. United States Plywood Corp.,* 18 F.R.D. 463 (S.D.N.Y.1956). The rationale of those cases seems to be that the information which patent attorneys utilize in preparing their opinions or advising their clients is in the public domain, not confidential, so no privilege can attach. A second basis for these decisions is that in evaluating the merits of the patent, the attorney acts, not as an attorney, but as a technician.

More recent cases convince this court that those cases have lost much of their vitality. Work product and attorney-client privileges exist in the field of patent law and must be respected by the court in regulating discovery."
*Collins and Aikman Corp. v. J. P. Stevens & Co.,* 51 F.R.D. 219, 220 (D.S.C.1971).

"We hold that in a particular situation both attorney-client and work product immunity may be available to the solicitation of a party's own patent. We reject the absolute rule urged by appellant. We deem it wise that flexibility be maintained and that sound judicial discretion be exercised on a case by case basis."
*In re Natta,* 410 F.2d 187 (3rd Cir. 1969).
*See, also, Natta v. Hogan,* 392 F.2d 686 (10th Cir. 1968); *Jack Winter, Inc. v. Koratron Co., Inc., supra; Collins & Aikman Corp. v. J. P. Stevens & Co.,* 51 F.R.D. 219 (D.S.C.1971); *In re Natta,* 163 U.S.P.Q. 680 (D.Del.1969); *Sperti Products, Inc. v. Coca-Cola Co.,* 262 F.Supp. 148 (D.Del.1966); Comment, "The Patent Practitioner Attains

Majority: An Examination of the Attorney-Client Privilege and 'Work Product Rule as They Pertain to the Patent Attorney and Agent", 4 Seton Hall Law Review 531 (1973); *but see, Underwater Storage, Inc. v. United States Rubber Co.,* 314 F.Supp. 546 (D.D.C.1970).

 Not all communications relevant to patent matters between attorney and client or between attorneys are protected under attorney-client privilege or work product immunity. The scope of protection can be determined only on a case-by-case basis, bearing in mind the purposes of the protection and the need for "flexibility and sound judicial discretion". The desire to protect the confidentiality of the attorney-client relationship and to preserve the integrity of the adversarial process must be balanced against the public interest in full and frank disclosure to the Patent Office and the liberal spirit of the discovery rules. *See,* "Developments in the Law—Discovery", 74 Harvard Law Review 940 (1961). Defendant's request for disclosure and plaintiff's claim of privilege as to each document can only be assessed in light of those competing considerations.

### A. Attorney-Client Privilege.

 The attorney-client privilege is designed to promote full disclosure by the client to his attorney by protecting the confidentiality of communications between the client and the attorney. Only if the client is assured that the information he relays in confidence, when seeking legal advice, will be immune from discovery will he be encouraged to disclose fully all relevant information to his attorney.

"In a society as complicated in structure as ours and governed by laws as complex and detailed as those imposed upon us, expert legal advice is essential. To the furnishing of such advice the fullest freedom and honesty of communications of pertinent facts is a prerequisite. To induce *clients* to make such communications, the privilege to prevent their later disclosure is said by courts and commentators to be a necessity. The social good

derived from the proper performance of the functions of lawyers acting for their clients is believed to outweigh the harm that may come from the suppression of the evidence in specific cases." *People's Bank v. Brown,* 3 Cir., 112 F. 652, quoted in *United States v. United Shoe Machinery Corp.,* 89 F.Supp. 357, 358 (D.Mass. 1950).

The often-quoted language of Judge Wyzanski in *United States v. United Shoe Machinery Corp.,* 89 F.Supp. 357 (D.Mass.1950), sets out the conditions which must be satisfied:

"The privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client." 89 F.Supp. at 358-59.

 It is essential that the communications between client and attorney concern legal assistance and advice in order to be privileged. It is not essential, however, that the request for advice be express. Client communications intended to keep the attorney apprised of continuing business developments, with an implied request for legal advice based thereon, or self-initiated attorney communications intended to keep the client posted on legal developments and implications may also be protected. *Burlington Industries v. Exxon Corp.,* 65 F.R.D. 26 (D.Md.1974); *Jack Winter, Inc. v. Koratron Company, Inc., supra.* The privilege also extends to the attorney's legal advice and opinions which encompass the thoughts and confidences of the client. *Burlington Industries v. Exxon Corp., supra; Natta v.*

*Hogan, supra.* On the other hand, communications made in the routine course of business, such as transmittal letters or acknowledgement of receipt letters, which disclose no privileged matters and which are devoid of legal advice or requests for such advice are not protected. *Jack Winter, Inc. v. Koratron Company, Inc., supra; Duplan Corp. v. Deering Milliken, Inc.,* 397 F.Supp. 1146 (D.S.C.1975).

The application of the attorney-client privilege to communications made in connection with patent prosecution or enforcement raises some difficult line-drawing problems. Is an employee who is not necessarily a member of a control group, but who develops and communicates information to the attorney at the direction of a "control group" member, a "client" for the purposes of the privilege? When is the communication between client and attorney concerned primarily with legal advice and when does it involve primarily business advice? When is technical information (such as results of research, tests and experiments), which is communicated to the attorney, unprotected because of the duty of full disclosure to the Patent Office?

■ Since a corporation acts only through its representatives the Court must distinguish between those employees who act as representatives of the corporation and those who do not. Only the former qualify as "clients" for the purpose of the privilege. In making that determination, the Court has considered all the relevant circumstances, including the nature and content of the communications, the extent of the disclosure within the corporation, the relationship of the employees involved to the communication and to the corporation, and the purpose of the attorney-client privilege. *Eutectic Corp. v. Metco, Inc.,* 61 F.R.D. 35 (E.D.N.Y.1973).

■ Plaintiff has submitted an uncontroverted affidavit listing the titles and responsibilities of each employee of Hercules who sent or received any of the disputed documents. *See* Affidavit of Edwin H. Dafter, Jr., Esquire. The Court is satisfied that all of those employees fall within the scope of the attorney-client privilege. Most of the named employees, outside of the Legal and Patent Departments,[7] occupy positions of executive responsibility in the operating divisions or Research Department of Hercules.[8] The documents reflect that they were kept apprised, on a continuing basis, of specific and general legal developments relevant to the area of their responsibilities, and that they had authority to control or substantially participate in decisions to be taken on the advice of the lawyer. Consequently, those employees can be con-

---

7. House attorneys employed by Hercules in the Patent and Legal Departments acted as attorneys with respect to communications from non-legal employees of Hercules, and as representatives of the client when relaying information or requesting advice from outside counsel. The following were members of the two departments who either sent or received any of the disputed communications:

Patent Department: Peterson (Head); Dafter, Miller, Farabow, Alexander (attorneys); Whitson (agent).

Legal Department: Turk (Senior Counsel); Fulwiler (Assistant General Counsel); Maddock (General Counsel); Johnson, W.C. Brown, Long (Vice-Presidents).

8. The following were members of the operating divisions and research department who received or sent any of the communications in question:

Polymers Department: W.C. Brown (General Manager); Giacco (General Manager); John-stone (Assistant General Manager); LeBlanc (Technical Director); Hendricks (Manager, Licensing); Grassie (Director of Development); B.F. Brown (Technical Development Representative; New Product Supervisor; Assistant Product Manager—Plastics; Product Manager—Polyolefins; Manager—Advanced Planning).

Pine & Paper Chemicals Department: Sheffield (General Manager); Jones (General Manager); George (Assistant General Manager); B.F. Brown (Supervisor Elastomer Department 4/66 to 1/68).

Research Department: VanWyck, McBurney (Directors, Research Center); Spurlin (Technical Assistant, Research Center); Scott (Manager, Polymers Research Division); Keim (Senior Chemist, Polymers Research Division); Christman, Lukach (Research Chemists, Polymers Research Division); Amberg (Research Chemist, Applications Division); Vandenberg (Senior Chemist, Central Research Division); Christman (Research Chemist, Explosives and Chemical Propulsion Research Division).

sidered members of the corporate "control group". *City of Philadelphia v. Westinghouse*, 210 F.Supp. 483 (E.D.Pa.1962).

▋ It is not as clear that Keim and Vandenberg, senior chemists in the Research Department, and Christman, Lukach and Amberg, research chemists in the Research Department, were members of the control group. Although each of them had some input into the decision-making process, their major contribution was in performing experiments and relaying technical information upon request to attorneys in the Patent Department. Those chemists were operating, however, at the express or implied direction of control group members to supply the attorneys with the necessary technical information and expertise pursuant to a request for legal advice. The Court must consider that, at least with respect to patent matters, members of the control group often will not have personal access to the required technical information. The policy of full disclosure underlying the attorney-client privilege requires the preservation of the confidentiality of that information when it is communicated at the direction of a member of the control group, for the purpose of soliciting legal advice. In *Duplan Corporation v. Deering Milliken, Inc., supra,* the court considered this problem in the context of the day-to-day workings of a corporation:

"Thus, the main consideration is whether the particular representative of the client, to whom or from whom the communication is made, is involved in rendering information necessary to the decision-making process concerning a problem on which legal advice is sought. One can envision that in some situations, the attorney has to go far down the ranks; in other instances, the attorney can obtain the necessary information close to the top. The extent of the attorney-client privilege will vary with the individual situation; the climates are seldom identical."

9. In any event, since Document No. 61 was an intra-departmental communication between Whitson and Miller with respect to an interference proceeding, not reflecting information re-

397 F.Supp. at 1165.

It is apparent, from the affidavits presented and the documents themselves that much of the necessary technical information could be obtained only from the chemists in the Research Department. Consequently, all doubts about applicability of the privilege to communications to or from Keim, Vandenberg, Christman, Lukach and Amberg have been resolved in favor of the plaintiff.

With respect to the attorneys who received or sent communications, there is a question only about Whitson, who is listed as a patent agent in the Hercules Patent Department. There is authority for the proposition that no communications between client and a patent agent are subject to the attorney-client privilege. *Duplan Corp. v. Deering Milliken, Inc., supra; Rayette-Faberge, Inc. v. John Oster Manufacturing Co.,* 47 F.R.D. 524 (E.D.Wis.1969); *Joh. A. Benckiser G.m.b.H. Chem. F. v. Hygrade Food Prod. Corp.,* 253 F.Supp. 999 (D.N.J.1966). Most of the cases deal, however, with communications between the client and an outside patent agent who handles patent matters on an independent basis. In certain circumstances, a patent agent employed in the Patent Department of a corporation may qualify as a "subordinate" of an attorney if he is working at the direction of and under the supervision of an attorney. *See, Congoleum Industries, Inc. v. G.A.F. Corporation,* 49 F.R.D. 82 (E.D.Pa. 1969).

▋ Only one document, Number 61, was sent to or received by Mr. Whitson. That document concerns a request for legal research to be performed by the agent, for the benefit of the attorney. The Court can see no difference between this request and one made to a junior associate in a law firm. In both cases, the work would be performed under the direct supervision of the attorney, to be used in the rendering of legal advice. Accordingly, protection [9] will

ceived from the client, the communication is most properly protected as attorney work product. *See infra* at 150–154.

not be denied to Document Number 61 on the basis that it was communicated to a patent agent.

■ The determination of when an attorney is "acting as a lawyer" is particularly difficult in patent matters. Since the Supreme Court indicated in *Sperry v. State of Florida*, 373 U.S. 379, 83 S.Ct. 1322, 10 L.Ed.2d 428 (1963) that the preparation and prosecution of patent applications are "hallmark activities of a lawyer", courts have consistently held that confidential communications between attorney and client for the purpose of securing legal advice concerning preparation or prosecution of a patent application are protected, whether the attorney is employed as outside counsel, house counsel, or as a member of the Patent Department. The holding of early cases such as *Zenith Radio Corp. v. Radio Corp. of America*, 121 F.Supp. 792 (D.Del.1954); and *American Cyanamid Co. v. Hercules Powder Co.*, 211 F.Supp. 85 (D.Del.1962) that an attorney was not acting as a lawyer when making initial office preparatory determinations of patentability drafting or comparing patent specifications and claims; preparing the application for letters patent or amendments thereto and prosecuting patents or handling interferences is consequently of little weight. *See, Collins & Aikman Corp. v. J.P. Stevens & Co.*, *supra*; *Chore-Time Equipment, Inc. v. Big Dutchman, Inc.*, 255 F.Supp. 1020 (W.D.Mich. 1966); *Ledex, Inc. v. U. S.*, 172 U.S.P.Q. 538 (Ct.Cl.1972).

■ The problem remains, however, of separating out business from legal advice. An important responsibility of most patent attorneys, especially those employed by corporate patent departments, is to assess the business implications of the company's patent position. Many of the communications between the patent attorney and non-legal personnel of the corporation would therefore predominately reflect business concerns, such as the competitive position of the company, marketing strategy, licensing policy, etc. The Court recognizes that business and legal advice may often be inextricably interwoven. A single proposed course of conduct such as patenting and licensing of an invention will have both legal and business ramifications, and the lawyer may advise as to both in a single communication. As was pointed out in *Jack Winter, Inc. v. Koratron, Inc., supra*, it is necessary to separate out the two, in the interest of preserving the integrity of the privilege itself:

"As is not infrequently the case in patent matters, the problem of classification here was particularly troublesome as the attorneys for Koratron performed virtually every task incident to filing for and obtaining a patent or trademark registration. They were so closely associated with the activities of Koratron that picking out from the mass of documents presented to the court those which involved non-legal transactions not soliciting or offering legal advice, and the separating of these from documents which did involve the exercise of the attorney's art, became at times an arduous and complex exercise. Yet we have sought to not lose sight of the importance of the distinction, for it is important that the attorney-client privilege not be down-graded in the interests of expedient results." 54 F.R.D. at 47.

If the primary purpose of a communication is to solicit or render advice on non-legal matters, the communication is not within the scope of the attorney-client privilege. Only if the attorney is "acting as a lawyer" —giving advice with respect to the legal implications of a proposed course of conduct—may the privilege be properly invoked. In addition, if a communication is made primarily for the purpose of soliciting legal advice, an incidental request for business advice does not vitiate the attorney-client privilege.

■ The attorney-client privilege does not protect technical information such as the results of research, tests, and experiments communicated to the attorney, not calling for a legal opinion or interpretation, but meant primarily for aid in completing a patent application. *Jack Winter, Inc. v.*

*Koratron Company, Inc., supra; Duplan Corp. v. Deering Milliken, Inc., supra.* The attorney serves merely as a conduit for such information to the Patent Office. The fact that a communication contains technical information, however, does not automatically preclude application of the privilege. If the primary purpose of the document is to solicit legal advice based on that information, the privilege applies. The procedure employed by Judge Doyle in *Jack Winter, Inc. v. Koratron Co., Inc., supra,* is instructive:

"A number of documents have been ruled to fall outside the boundaries of the attorney-client privilege. This has been done only after most careful consideration of the actual contents of each document. The determinations have been particularly difficult in instances of communications primarily factual in nature. Generally, when factual information was communicated so that the attorney could disclose it in a patent or trademark application, the communication was viewed as non-privileged. On the other hand, documents containing considerable technical factual information but which were nonetheless primarily concerned with giving legal guidance to the client were classified as privileged. In other words, doubts have been resolved in favor of the privilege." 54 F.R.D. at 46.

■ On the basis of the foregoing, the following documents are not protected by the attorney-client privilege:[10]

| Document No. | Identification of Documents and Recipients | Reason |
|---|---|---|
| 24 | Memo - February 2, 1965<br>From: Miller<br>To: Christman | Request for information for purpose of submitting to Patent Office. |
| 25 | Letter - February 23, 1966<br>From: Miller<br>To: Hoxie | Transmittal letter; no request for legal advice or privileged information. |
| 26 | Memo - March 10, 1965<br>From: Miller<br>To: File | Information from client to be submitted to Patent Office. |
| 27 | Memo - April 22, 1965<br>From: Miller<br>To: Spurlin | Transmittal letter; no request for legal advice or privileged information. |
| 47 | Memo - March 28, 1963<br>From: Miller<br>To: Peterson | Request for meeting; no request for legal advice or privileged information. |
| 83 | Memo - August 15, 1966<br>From: Dafter<br>To: Brown;<br>cc: Sheffield, Turk | Primarily business advice. |
| 89 | Memo - January 13, 1966<br>From: Dafter<br>To: File | Primarily business advice. |
| 92 | Memo - December 20, 1966<br>From: Turk<br>To: Brown<br>cc: Sheffield, Dafter | Transmittal letter; no request for legal advice or privileged information. |

10. Plaintiff also claimed work product immunity as to most of these documents. After careful consideration of each document, the Court determined that, if any privilege would apply, attorney-client privilege would be applicable.

| Document No. | Identification of Documents and Recipients | Reason |
|---|---|---|
| 99 | Memo - June 24, 1966<br>From: Dafter<br>To: File | Primarily business advice. |
| 109 | Letter - May 2, 1963<br>From: Whiting<br>To: Miller | Transmittal letter; no request for legal advice or privileged information. |
| 113 | Letter - May 29, 1963<br>From: Hoxie<br>To: Miller | Information obtained from client to be submitted to Patent Office. |
| 123 | Letter - January 22, 1964<br>From: Hoxie<br>To: Miller | Transmittal letter; no request for legal advice or privileged information. |
| 155 | Memo - June 4, 1963<br>Notes by Hoxie | Results of tests to be submitted to Patent Office (first four pages only). |
| 156 | Manuscript Notes -<br> June 2, 1963<br>By: Hoxie | Results of tests to be submitted to Patent Office (first two pages, page 8 only). |
| 220 | Letter - October 26, 1966<br>From: Dafter<br>To: Mandelbaum | Transmittal letter; no request for legal advice or privileged information. |
| 225 | Memo - November 14, 1966<br>From: Miller<br>To: Johnson, Sheffield,<br>Brown, Dafter, Maddock,<br>and Peterson. | Reminder to employees of meeting. |
| 228 | Memo - November 23, 1966<br>From: Miller<br>To: Johnson, Sheffield,<br>Brown and Dafter. | Reminder to employees of meeting. |
| 239 | Note - February 10, 1970<br>From: Turk<br>To: Jones<br> cc: Giacco and Dafter | Transmittal letter;no request for legal advice or privileged information. |
| 241 | Note - October 21, 1970<br>From: Dafter<br>To: Brown<br> cc: Turk | Transmittal letter; no request for legal advice or privileged information. |
| 244 | Note - March 23, 1970<br>From: Dafter<br>To: Schneider | Primarily business advice. |

## B. Work Product.

 Plaintiff's claim of work product immunity must be considered as separate and apart from claims of attorney-client privilege, as the two protections are distinct:

"While the work product doctrine is closely related to the attorney-client privilege because the work product represents efforts expended by the attorney during the course of the attorney-client relationship (citation omitted), the two concepts are treated quite differently and, in the eyes of the law, are independent legal concepts reflecting different policy considerations."

*Kearney & Trecker Corp. v. Giddings & Lewis, Inc.,* 296 F.Supp. 979 (E.D.Wis. 1969).

*See also, Radiant Burners, Inc. v. American Gas Assoc.,* 320 F.2d 314 (7th Cir. 1963). The Court in *Scourtes v. Fred W. Albrecht Grocery Co.,* 15 F.R.D. 55, 58 (N.D.Ohio 1953), outlined the difference between the policies behind the two doctrines:

" . . . The purpose of the attorney-client privilege is to encourage full disclosure of information between an attorney and his client by guaranteeing the inviolability of their confidential communications. The 'work product of the attorney', on the other hand, is accorded protection for the purpose of preserving our adversary system of litigation by assuring an attorney that his private files shall, except in unusual circumstances, remain free from the encroachments of opposing counsel."

The work product protection is a limited immunity of comparatively recent origin. In *Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947), the Supreme Court carved out a limited exception to the broad scope of discovery under the Federal Rules:

"Here is simply an attempt, without purported necessity or justification, to secure written statements, private memoranda and personal recollections prepared or formed by an adverse party's counsel in the course of his legal duties. As such, it falls outside the arena of discovery and contravenes the public policy underlying the orderly prosecution and defense of legal claims. Not even the most liberal of discovery theories can justify unwarranted inquiries into the files and the mental impressions of an attorney."

329 U.S. at 510, 67 S.Ct. at 393.

The doctrine has since been codified in Fed. Rules Civ.P.Rule 26(b)(3):

"Subject to the provisions of subdivision (b)(4) of this rule, a party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative . . . only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of his case and that he is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation."

In general, the doctrine protects memoranda, recorded mental impressions, synopses of witness statements, drafts of documents, etc., prepared by an attorney "with an eye to litigation", unless substantial good cause can be shown for its production.

The work product rule is the result of a balancing between the policy of full disclosure behind the federal discovery rules and "the desire to promote the effectiveness of the adversary system by safeguarding the vigorous representation of a client's cause from the possible debilitative effects of susceptibility to discovery". Developments in the Law—Discovery, *supra,* 74 Harvard Law Review at 1028. The policy behind the rule is not to protect all recorded opinions, observations and impressions of an attorney made in connection with any legal problem,

but to protect the integrity of the adversary process.

> "This work product immunity is the embodiment of a policy that a lawyer doing a lawyer's work in preparation of a case for trial should not be hampered by the knowledge that he might be called upon at any time to hand over the results of his work to an opponent." *Duplan Corp. v. Moulinage et Retorderie de Chavanoz,* 487 F.2d 480 (4th Cir. 1973).

The rationale is restricted to "in anticipation of litigation" on the theory that an attorney who does not envision litigation (except as a remote contingency of any legal action) will not anticipate discovery requests, and therefore the fear of disclosure will not deter full and adequate consideration of the client's problem.

The fact that litigation may still be a contingency at the time the document is prepared has not been held to render the privilege inapplicable, if the prospect of litigation is identifiable because of specific claims that have already arisen. *Sylgab Steel and Wire Corp. v. Imoco-Gateway Corp.,* 62 F.R.D. 454 (N.D.Ill.1974); *Stix Products, Inc. v. United Merchants & Manufacturers, Inc.,* 47 F.R.D. 334 (S.D.N.Y. 1969). The test to be applied is whether, in light of the nature of the documents and the factual situation in this particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation. 8 Wright & Miller, Federal Practice and Procedure § 2022. Courts have held work product immunity applicable to preliminary drafts of legal documents, license agreements and/or assignments, *Jack Winter, Inc. v. Koratron Co., supra*; opinion letters and background memoranda with respect to the scope and validity of patents and patent applications, *Sylgab Steel & Wire Corp. v. Imoco-Gateway Corp., supra; Stix Products, Inc. v. United Merchants & Manufacturers, Inc., supra*; attorney's analysis or assessments of a party's position with respect to other parties in an ongoing interference, *In re Natta,* 410 F.2d 187 (3rd Cir. 1969); and intra-office or file notes and memoranda containing summaries of conferences, legal research and comments on technical information, prepared by outside patent counsel or patent department attorneys in connection with an interference. *Natta v. Zletz,* 418 F.2d 633 (7th Cir. 1969).

Nor is the immunity limited to proceedings in a court of record. *In re Natta,* 410 F.2d 187 (3rd Cir. 1969). The work product rule applies equally to documents prepared in anticipation of proceedings before the Board of Patent Interferences. *Natta v. Zletz,* 418 F.2d 633 (7th Cir. 1969); *In re Natta,* 410 F.2d 187 (3rd Cir. 1969); *Natta v. Hogan,* 392 F.2d 686 (10th Cir. 1968); *Sperry Rand v. International Business Machines Corp.,* 45 F.R.D. 287 (D.Del.1968). Consequently, those documents in Category II which were prepared by attorney in anticipation of the *Adamek, et al. v. Tarney* Interference and which reflect the mental impressions, observations and/or opinions of the attorney are protected.

In this District, work product has been held applicable to documents generated in anticipation of ex parte proceedings in the Patent Office, as well as documents prepared in anticipation of interference proceedings. Judge Layton, in *In re Natta,* 48 F.R.D. 319, 321 (D.Del.1969), interpreted the language of the Third Circuit in *In re Natta,* 410 F.2d 187 (3rd Cir. 1969), as follows:

> But I am further convinced that the Third Circuit, in effect, went further and disapproved the distinction therein discussed between ex parte proceedings and interference proceedings and stated the law to be that documentary material relating both to ex parte applications for a patent, as well as patent interference proceedings, was subject to a claim of privilege.[4]

> [4] . . . In light of the discussion in the opinion, and the authorities there cited, I feel that 'patent solicitation' must be read to cover both patent applications and interference proceedings.

48 F.R.D. at 321.

The scope of that privilege is still limited, however, by the requirement that the docu-

ment be prepared "with an eye toward litigation". The prosecution of an application before the Patent Office is not an adversary, but an ex parte proceeding. Although the process involves preparation and defense of legal claims in a quasi-adjudicatory forum, the give-and-take of an adversary proceeding is by and large absent. In addition, implicit in the applicant's duty of full disclosure to the Patent Office is the attorney's responsibility to make a complete investigation of the merits of the applicant's claim. A blanket rule permitting claims of work product as to any documents generated in anticipation of a patent prosecution is therefore unnecessary to provide additional incentive for the attorney to investigate and prepare the application fully.

On the other hand, a responsible patent attorney always anticipates the possibility of future litigation involving the patent. It is possible that, during the ex parte prosecution, certain memoranda or recordings, etc. prepared by the attorney may reflect concerns more relevant to future litigation than to the ongoing prosecution. If the primary concern of the attorney is with claims which would potentially arise in future litigation, the work product immunity applies; if the attorney's primary concern is claims which have arisen or will arise during the ex parte prosecution of the application, however, the work product rule does not apply.

Document No. 22, from one patent department attorney to another requesting a "law search", primarily reflects a concern with future litigation and is therefore protected. The following documents are not protected by attorney work product because they primarily reflect concerns with claims raised in the ex parte prosecution of the Adamek patent application:

| Document No. | Type of Document |
|---|---|
| 17 | Memorandum to file reflecting information obtained from third party with respect to ex parte prosecution. |
| 30 | Internal Memorandum re scope of specification in patent application. |
| 139 | Attorney's handwritten notes on copy of foreign patent specification. |
| 142, 146, 147, 148, 149, 150, 200 | Drafts of affidavits to be presented to Patent Examiner. |
| 151, 152, 153 | Draft claims and manuscript notes re ex parte prosecution.[11] |
| 197 | Draft amendment with attorney's handwritten notes. |
| 199 | Draft amendment with attorney's handwritten notes. |
| 201 | Attorney's handwritten notes on copy of affidavit filed in Patent Office. |
| 202 | Attorney's handwritten notes on copy of Patent Office Action. |
| 203 | Draft amendment with attorney's handwritten notes. |
| 211 | Draft amendment with attorney's handwritten notes. |

11. These documents appear to contain outside counsel's notes on certain scientific information relevant to the prosecution of the Adamek application. If the information was obtained

Several of the documents which plaintiff claims are protected by work product were prepared in anticipation of litigation between plaintiff and a third party, Copolymer Rubber & Chemical Corporation. Although some courts have held that documents prepared for one case are freely discoverable in a different case,[12] this Court accepts the "sounder view" that the documents prepared for one case have the same protection in a second case where the two cases are closely related in parties or subject matter. *See, Burlington Industries v. Exxon Corporation, supra; Duplan v. Deering Milliken, Inc., supra; Republic Gear Co. v. Borg-Warner Corp.,* 381 F.2d 551 (2d Cir. 1967); 8 Wright & Miller, Federal Practice and Procedure § 2024. Plaintiff in the instant case was also plaintiff in the *Hercules v. Copolymer* litigation. The joint venture agreement which gave rise to the causes of action in *Hercules v. Copolymer* concerned joint production of EPT rubber under the Adamek patent. Consequently, many of the issues were related to the one involved here. Under those circumstances, the protection applicable in those proceedings extends to the instant proceeding.

Defendant has not made any showing of substantial need or undue hardship in obtaining the substantial equivalent of the materials by other means. The Court recognizes the difficulty of making such a showing without having access to the documents themselves. However, the Court sees no reason why the defendant would not be able to obtain relevant information contained in those documents through other discovery means, such as depositions and interrogatories. Accordingly, production

will be denied. *See, Xerox Corp. v. International Business Machines Corp.,* 64 F.R.D. 367 (S.D.N.Y.1974); *Miles v. Bell Helicopter Co.,* 385 F.Supp. 1029, 1032 (D.Ga.1974).

### C. Fraud.

In opposition to plaintiff's claims, defendant relies primarily on a showing of alleged fraud to vitiate any privilege or immunity. Defendant avers that, during the prosecution of the Adamek patent, representatives of Hercules intentionally misrepresented or withheld facts relevant to the scope of prior art and concealed or only partially represented the results of relevant ex parte tests, and that accordingly protection should be denied as to all disputed documents.

Allegedly, these misrepresentations and failures to reveal were motivated by a desire to obtain "broadened" claims which would cover terpolymers made with a bridged-ring compound having an exocyclic double bond such as those then being manufactured by Exxon. In the original specification to the Adamek, et al. application, the examples use a bridged-ring compound with two double bonds inside the rings, such as DCP. *See* note 2, *supra.* In November, 1964, attorneys for Adamek filed amended claims which specified that the bridged-ring hydrocarbon contain at least two double bonds.[13] That amendment was rejected as overly broad and failing to point out and distinctly claim the invention on the ground, *inter alia,* that the claims read on compounds wherein the double bonds may be either in the ring or in a straight-chain, side substituent (i. e., containing an exocyclic double bond), or both. The Examiner remarked that the claims could be placed in

---

from the client, and is confidential, the documents might be protected under the attorney-client privilege. However, the notes appear to be primarily jottings on different chemical structures, etc. That information could have been derived from independent research and in any event does not appear to be confidential in nature. Since plaintiff has made no showing as to the origin of the information, doubts have been resolved against the privilege.

12. *See, e. g., Honeywell, Inc. v. Piper Aircraft Corp.,* 50 F.R.D. 117 (M.D.Pa.1970); *U. S. v.*

*International Business Machines Corp.,* 66 F.R.D. 154 (S.D.N.Y.1974).

13. The claims as originally filed specified only that the bridged-ring compound contain at least one double bond, but could contain more. The preferred embodiment contained two double bonds. The November, 1964 amendment specified "an ethylenically unsaturated bridged-ring hydrocarbon containing at least two ethylenic double bonds".

allowable condition by limiting the bridged-ring compounds to those containing only two double bonds, which double bonds are both inside the rings. *See*, Office Action December 14, 1964, File Wrapper of Adamek Application, Serial No. 748,165, p. 169. Plaintiff maintained, at the time and in argument on the present motions, that the invention is broad enough to cover both types of compounds—those with both bonds inside the rings and those with one double bond inside the ring and one on an exocyclic side chain. In support of its position before the Patent Office, plaintiff presented to the Examiner a number of affidavits and arguments with respect to the operability and usefulness of compounds with an exocyclic double bond. Defendant urges that in those affidavits and arguments, plaintiff made certain fraudulent misrepresentations and omissions which were material to the Examiner's decision to grant the Adamek patent.

Specifically, defendant contends that plaintiff fraudulently misrepresented the state of prior art, in that plaintiff failed to inform the Patent Office of three relevant prior art patents: (1) U.S. Patent No. 2,933,480 to Gresham, which disclosed an EPT rubber using a straight-chain diene as the third monomer;[14] (2) Belgian Patent No. 546,150, assigned to Montecatini, which disclosed the use of cyclopentadiene[15] as a termonomer for alpha-olefins; and (3) Belgian Patent No. 543,292, assigned to Goodrich-Gulf, which discloses the use of cyclic dienes[16] as termonomers for alpha-olefins. Plaintiff admits that during prosecution of the Adamek patent, it had knowledge of

the Gresham and Goodrich-Gulf Belgian patents, but points out that none of the patents in question disclosed the use of bridged-ring hydrocarbons as the third monomer. According to plaintiff, the Gresham and Goodrich-Gulf references were felt to be irrelevant to the Adamek prosecution, since the novelty of the Adamek invention lay in the use of the bridged-ring compounds, which were allegedly significantly different from the cyclic or straight-chain compounds used by others.

Defendant further alleges that an affidavit of Dr. Woodhams, one of the inventors of the patent in suit, which was presented to the Patent Office in connection with the November, 1964 amendments, is misleading and incomplete. The Woodhams' affidavit was apparently prepared in response to the Examiner's expressed concern that the use of a bridged-ring compound with an exocyclic double bond might produce an inoperative copolymer. Keim and Christman repeated one of the examples of the Adamek application, using such a bridged-ring compound, 5-vinyl-2-norbornene, and sent the resulting product to Woodhams for testing. Woodhams reported that the product was operative, that is, that it did vulcanize with sulfur. Defendant alleges that those tests and subsequent tests which were not reported to the Patent Office, showed "poor" or "indifferent" results, but that later plaintiff made representations to the Patent Office on the basis of those results to the effect that a commercially attractive terpolymer could be produced from 5-vinyl-2-norbornene in accordance with Adamek, et al. In response, plaintiff contends that

**14.** A straight-chain hydrocarbon is one in which all the carbon atoms occur in a continuous, rather than cyclic, sequence, i. e., 1, 4 hexadiene:

$$H_2C = CH - CH_2 - CH = CH - CH_3$$

**15.** Cyclopentadiene is a cyclic diene with the following structure:

Dicyclopentadiene (DCP) is a dimer of cyclopentadiene, formed by the union of two cyclopentadiene molecules.

**16.** Cyclic dienes, such as cyclopentadiene (*supra* at n. 15) differ from bridged-ring dienes in that there is no bridge within the ring structure connecting two nonadjacent carbon atoms. *See, supra*, n. 2.

defendant has illegitimately juxtaposed representations made in several different affidavits presented to the Patent Office. According to plaintiff, the Woodhams' affidavit correctly reported the test results, and those results were intended only to determine whether or not vinyl norbornene terpolymers could be sulfur-cured, not whether the product had optimal physical properties. Later representations as to the usefulness and commercial attractiveness of such terpolymers were made by Dr. Spurlin, Technical Assistant in the Hercules Research Center, allegedly on the basis of later, more extensive work by Hoechst, a German company affiliated with Hercules, and others.

■ Communications between attorney and client, otherwise protected, which are made in furtherance of a crime or fraud are not protected by attorney-client privilege or work product immunity. *Clark v. U. S.,* 289 U.S. 1, 53 S.Ct. 465, 77 L.Ed. 993 (1933); *Natta v. Zletz,* 418 F.2d 633 (7th Cir. 1969); *Duplan Corp. v. Deering Milliken, Inc., supra.* On a discovery motion, the moving party bears the burden of showing, first, a prima facie case of fraud:

> "We begin with the observation that while a prima facie showing need not be such as to actually prove the disputed fact, it must be such as to subject the opposing party to the risk of non-persuasion if the evidence as to the disputed fact is left unrebutted." (footnotes and citations omitted). *Duplan Corp. v. Deering Milliken, Inc.,* 540 F.2d 1215 (4th Cir. 1976).

Second, defendant must show that the communications were made in furtherance of the fraud. *W. R. Grace & Co. v. P. Ballantine & Sons, Inc.,* 175 U.S.P.Q. 464 (D.N.J. 1970). Communications made before the fact of or during the commission of a fraud

are not protected, since to allow protection to attach to such communications would permit an attorney to be a principal or accessory to a fraud without fear of discovery and would permit the client to commit fraud with the aid of legal advice beforehand. Communications after the fact are still protected, however, since one of the primary purposes of the attorney-client privilege is to allow consultation in the interest of establishing a legal defense. *Burlington Industries v. Exxon Corp., supra; Duplan Corp. v. Deering Milliken, Inc.,* 397 F.Supp. at 1172. In *W. R. Grace & Co. v. P. Ballantine & Sons, Inc., supra,* for instance, the court held that any documents dated later than the date of the issuance of the patent in suit would not lose protection on the grounds of fraud, since the documents were not prepared until after completion of the alleged fraud.

■ At this point, the Court does not find it necessary to decide whether a prima facie case of fraud has been made out by defendant. Even assuming *arguendo* that defendant had shown a prima facie case of fraud, none of the protected documents could be said to have been prepared in furtherance of that fraud.[17] Many of the documents are dated later than October 12, 1965, the date of issuance of the Adamek patent. Defendant urges that nevertheless some of those documents may contain information relevant to the fraud, and therefore should be discoverable. The fraud exception is a narrow one. If the documents were prepared subsequent to completion of the alleged fraud, they could not be "in furtherance" of the fraud. In any event, none of the documents, including those prepared subsequent to the issuance of the patent, relate to the alleged instances of fraud or reflect information, opinion or ad-

17. Since counsel for defendant has not had an opportunity to see any of the disputed documents, it is obviously difficult for counsel to demonstrate that particular documents were generated in furtherance of fraud. Presumably, if the documents had been made available, counsel would have argued strenuously in favor of the discoverability of certain of those documents. In the absence of such an opportunity, the Court has examined with particular care all the documents which would otherwise be protected by attorney-client privilege or work product immunity for subject matter and content, in light of the documentary evidence presented by defendant.

vice relevant to the issues of scienter or intent. The bulk of the documents were prepared in connection with proceedings other than the ex parte prosecution of the patent,[18] and reflect rather the immediate concerns of the attorney and client with respect to distinct and separate issues. Those documents which deal directly with the ex parte prosecution do not contain information or advice which could be construed as "furthering" the alleged fraud. Accordingly, none of the protected documents are discoverable on the grounds of fraud. The Court does not reach, however, the merits of defendant's showing.

*D. Waiver.*

■■■ Finally, defendant contends that plaintiff has waived any privilege or immunity it might otherwise assert. Plaintiff has produced 31 documents, previously identified as privileged, without reservation as to waiver of privilege. Eighteen of those documents were apparently produced "inadvertently". In general, the voluntary waiver by a client, without limitation, of one or more privileged documents passing between a certain attorney and the client discussing a certain subject waives the privilege as to all communications between the same attorney and the same client on the same subject. *Duplan v. Deering Milliken, Inc., supra,* and cases cited therein. Similarly, an attorney may be held to have waived work product immunity by voluntarily producing certain documents which otherwise would be protected under the work product doctrine. Since the attorney-client privilege is a *client's* privilege, while work product immunity may be invoked only by an attorney, waiver of attorney-client privilege does not necessarily also waive work product immunity, as to an attorney's memoranda on the same subject. *See, Duplan Corp. v. Deering Milliken, Inc.,* 540 F.2d 1215 (4th Cir. 1976).

■■■ This qualification to the rule of attorney-client or work product protection can only be applied with reference both to the objectives of the protection and of the qualification. *International Business Machines, Inc. v. Sperry Rand Corp.,* 44 F.R.D. 10 (D.Del.1968). The underlying rationale is one of fairness. A party cannot disclose only those facts beneficial to its case and refuse to disclose, on the grounds of privilege, related facts adverse to its position:

> "When a client voluntarily waives the privilege as to some documents that the client considers not damaging and asserts the privilege as to other documents that the client considers damaging, the rule compelling production of all documents becomes applicable. The reason behind the rule is one of basic fairness."

*Duplan Corp. v. Deering Milliken, Inc.,* 397 F.Supp. at 1161-2.

Even if certain facts or documents were disclosed inadvertently, the protection may be waived. *Duplan Corp. v. Deering Milliken, Inc., supra; Underwater Storage, Inc. v. U. S. Rubber Co.,* 314 F.Supp. 546 (D.D.C. 1970).

Defendant's argument with respect to the expansiveness of the waiver exception [19] is unfounded in the law. The waiver exception has been narrowly construed. *International Business Machines v. Sperry Rand Corp., supra.* The privilege or immunity has been found to be waived only if facts relevant to a particular, narrow subject matter have been disclosed in circumstances in which it would be unfair to deny the other party an opportunity to discover other relevant facts with respect to that subject matter. In *International Business Machines v. Sperry Rand Corp., supra,* the Court held the privilege waived only "to the limited extent that it dealt with the defects in the BINAC which Sperry believed Northrop had excused". In *International Paper Co. v. Fibreboard Corp.,* 63 F.R.D. 88

---

18. Only the documents in Categories I and VII deal contemporaneously with the ex parte prosecution. Some of the documents in Categories II, IV, V, VI, and VII reflect peripheral concerns with the prosecution of the application, mostly on a post hoc basis.

19. At oral argument, counsel for defendant maintained that "as a rule of law", if privilege is waived with respect to documents of one kind, it is waived as to all documents. Transcript of Hearing before Wright, J., February 8, 1977, p. 9.

(D.Del.1974), defendant made certain factual assertions in an affidavit with respect to a specific meeting between the Patent Examiner and defendant's counsel. The Court then permitted plaintiff the opportunity to discover other relevant factual details leading up to and including that meeting that were not mentioned in the affidavit. Judge Latchum, in *Lee National Corp. v. Deramus,* 313 F.Supp. 224 (D.Del.1970), required defendant to identify certain occasions on which particular subjects relating to by-law and charter amendments were discussed with counsel. In that case, defendant had freely and voluntarily revealed that the particular subject matter had been discussed on several other specific occasions. Significantly, the Court refused to extend the privilege beyond that limited waiver.

After a careful comparison of the disputed documents with those which have been produced by plaintiff, the Court finds that there has been no waiver either of the attorney-client privilege or of work product immunity with respect to any of the documents. For the most part, the subject matter of the produced documents does not overlap with that of the protected documents. A few documents do overlap to some extent, but only very generally, as being broadly concerned with the progress of the application, licensing policy, etc. The Court found no document which would unfairly deprive defendant of access to facts relevant to particular subject matter disclosed in already produced documents.

II. *Motion to Compel Answers to Interrogatories.*

Defendant has also filed a motion to compel answers to two interrogatories relating to plaintiff's contentions as to the disclosure of the patent in suit. Plaintiff has objected to the proposed interrogatories as irrelevant to the issues in suit, vague, burdensome, and calling for information in the possession of a third party.

There is no objection to the form of the interrogatories in question.[20] An interrogatory may properly inquire into a party's contentions in the suit:

"There is nothing impermissible in asking a party to state what he presently contends in an effort to ferret out or narrow the issues." *Montecatini Edison v. Rexall Drug and Chemical Co.,* 288 F.Supp. 486, 489 (D.Del.1968).

Interrogatories have been allowed which call upon the patentee to interpret the claims of its own patent. *See, Scovill Manufacturing Co. v. Sunbeam Corp.,* 357 F.Supp. 943, 948 (D.Del.1973), and cases cited therein.

This Court previously ordered plaintiff to respond to a similar interrogatory as to whether it contended that the products manufactured by Exxon were disclosed and claimed by the patent in suit. Hercules objects here that the proposed interrogatories are irrelevant, since they do not request any information relevant to the actual infringement of the patent. Hercules interprets the interrogatories rather as requesting contentions on "hypothetical infringements" not involved in this suit.

Hercules' interpretation of the interrogatories as irrelevant is unwarranted. Exxon

---

**20.** Interrogatory No. 50 states: Specify which of the substituted norbornenes referred to in the Hercules Progress Report dated July 7, 1965 (Defendant's B. Brown Exhibit 28; H4732–H4743) plaintiff contends is a bridged-ring hydrocarbon third monomer of the type disclosed and claimed by the Adamek, et al. patent in suit.

Interrogatory No. 51 states: State whether or not plaintiff contends that cyclic-substituted norbornenes such as 5 (3-cyclohyxenyl)-2-norbornene referred to in the Hercules Progress Report dated July 7, 1965 . . . are bridged-ring hydrocarbon third monomers of the type disclosed and claimed by the Adamek, et al. patent in suit.

The interrogatory further requests plaintiff to identify the portions of the claims and specifications which plaintiff interprets as encompassing the above monomers and to state in detail the basis for such interpretation, and to identify all documents in the possession, custody or control of or otherwise known to plaintiff or Dunlop with respect to the subject of the interrogatory.

contends that the claims of the Adamek patent were unjustifiably broadened, by amendment, to cover a bridged-ring third monomer with a second exocyclic double bond, as the original specifications disclosed only the use of rings with endocyclic double bonds. Approval of the amendments was allegedly procured by misrepresenting to the Patent Office the operativeness of certain third monomers containing an exocyclic double bond. In support of this conclusion, Exxon relies in part on a Hercules Progress Report dated July 7, 1965 which lists results of tests performed using certain substituted norbornenes as third monomers. Those substituted norbornenes contain an exocyclic second double bond. The interrogatories in question ask whether Hercules contends that certain of those substituted norbornenes are disclosed and claimed by the patent in suit. The answers to those interrogatories, while not relevant to the infringement issues, are relevant to questions raised by defendant as to alleged fraud and inoperativeness of the invention, and are therefore permissible.

There is no merit to plaintiff's further objection to Interrogatory 51 as vague and indefinite. While the terms used by defendant may indeed encompass a number of different monomers, the interrogatory is clearly limited to those referred to in the Hercules Progress Report, which is a document prepared by Hercules' personnel. Plaintiff can protect itself by making explicit its construction of the terms of the interrogatory, so long as that construction is reasonable, in light of the knowledge and access to information of the respective parties.

■ Interrogatory 51 also requests plaintiff to identify documents relevant to the suitability of the cyclic substituted norbornenes as a third monomer. Plaintiff urges that defendant is equally capable of identifying documents, since all possible relevant documents have been produced. The fact that the discovery may be burdensome to plaintiff, however, is not sufficient to justify plaintiff's refusal to fully answer the interrogatory. Even though defendant may have physical possession of most of the documents concerned, it would be more efficient for plaintiff's representatives, who are responsible for answering the interrogatories and who are familiar with the documents, to identify relevant material, especially since the information requested relates to the contentions of plaintiff. It is also possible that there may be additional documents known to plaintiff which have not yet been produced because they were not relevant to any other issues raised.

Finally, plaintiff objects that the interrogatory calls for identification of documents in the control of a third party not involved in this suit, Dunlop Co., Ltd. Clearly, defendant could not address an interrogatory directly to Dunlop, since interrogatories may be directed only to parties. Fed.Rules Civ.P. Rule 33. The history of this case, however, demonstrates a close cooperative working relationship between Hercules and Dunlop. In the past, Hercules has made reasonable efforts to obtain documents and information from Dunlop relevant to the issues in this suit, and has apparently been generally successful in its efforts. Accordingly, Interrogatory 51 can be construed as requesting Hercules to make a good faith effort, in keeping with its previous experience, to obtain identification of relevant documents held by Dunlop.

In conclusion, the Court finds that the interrogatories in question are relevant, sufficiently definite and not unduly burdensome to plaintiff. Plaintiff will be required to respond to the interrogatories to the best of its ability.

Submit order.